**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1673-20

B.R.,

    Plaintiff-Appellant,

v.

R.R.,

    Defendant-Respondent.

_____

Submitted September 13, 2022 – Decided October 11, 2022

Before Judges Gilson and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FM-11-0185-19.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the brief).

Maselli Warren, PC, attorneys for respondent (Patricia Agoes, of counsel and on the brief; Deanne J. Lowden, on the brief).

PER CURIAM

Plaintiff B.R. appeals from a final judgment of divorce (FJOD).[1] He argues, among other things, that the trial judge erred in holding him in contempt based on his "abhorrent and disruptive" behavior during the trial. Finding no error in that or any other decision challenged by plaintiff, we affirm.

I.

We glean the following facts from the trial record. The parties were married in 2001. They had two children, born in 2005 and 2008, respectively. The parties separated during the summer of 2018. On August 7, 2018, defendant filed a domestic-violence complaint against plaintiff. On November 7, 2018, the court entered a final restraining order (FRO) against plaintiff on behalf of defendant. In the FRO, the court granted defendant temporary custody of the children and banned plaintiff from having contact with defendant and with the children unless permitted by the Division of Child Protection and Permanency. Defendant had filed other domestic-violence complaints against plaintiff dating back to 2004, all of which she withdrew. On August 14, 2018, plaintiff filed a complaint for divorce based on irreconcilable differences. On October 18, 2018, defendant filed an answer and counterclaim for divorce.

---

[1] We use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(10).

A-1673-20

Plaintiff's first outburst occurred on the opening day of the trial. While the trial judge and counsel were discussing plaintiff's use of funds and with no question pending, plaintiff declared the funds at issue were his funds and called defendant "a thief." The trial judge instructed plaintiff to "wait until you are in the witness chair and until it's your turn to tell me your story and certainly not blurting it out. It doesn't help. I can't consider it, okay?" Plaintiff, who was represented by counsel, then asked to speak with the judge alone in her chambers. The judge appropriately denied that request.

On the second day of trial, plaintiff took the stand to testify. He refused to look at defendant when his counsel asked him to identify her. Plaintiff repeatedly gave unresponsive and inflammatory answers to the questions posed to him and made extraneous comments when no question was pending. When asked to explain the circumstances of the parties' first meeting, plaintiff described defendant as "standing on a corner" appearing to be "a hooker." When asked if he recalled the date the parties were married, he accused defendant, who originally was from Guatemala, of coming "across the border numerous times illegal[ly]." He also asserted the marriage was "not legitimate."

When asked to state the alleged inaccuracies in the parties' marriage license, he accused defendant of "fraudulently obtain[ing] a birth certificate"

and a "fraudulent ID." When asked about the allegedly inaccurate date of defendant's birth on the marriage license, plaintiff asserted defendant did not know when she was born and accused her again of fraudulently obtaining a birth certificate and a driver's license. When asked again about the alleged inaccuracies on the marriage license, plaintiff declared for the first time to the apparent surprise of his lawyer that the parties had "committed marriage fraud and immigration fraud for the sole purpose of bringing [defendant] into the country."

When asked what date he was removed from the marital home, plaintiff did not provide a date but stated defendant had stolen his car, had a "paramour," and had threatened to "screw" and "fuck" him, take all of his money, and tell police plaintiff had hit her. When asked what he had left in the house, plaintiff claimed defendant had given the keys to "her boyfriend" and accused them of stabbing him in the back and trying to kill him. When asked how tenants would pay him rent, he accused defendant of stealing his "stuff." When asked if tenants paid the rent in cash or by check, he responded that defendant was "stealing the ones that were given to [him] in cash." When asked to explain what he meant by his "labor" in connection with properties at issue, plaintiff referenced "these girls that want to screw you over." When asked about conditions of other

A-1673-20

properties, plaintiff referred to defendant as a "criminal" and accused her of stealing "everything" from him. When no question was pending, he asserted defendant had "used" him and had forced him to send his children to Catholic schools even though he was Jewish and did not like Catholic schools.

When asked what he meant when he contended his children were "freaking endangered," he stated his children were in danger of "being child molested by these nasty Guatemalan people" and that defendant had told him their daughter's virginity would be taken by "her freaking greasy boyfriend." Ignoring defense counsel's objection, plaintiff went on a diatribe about how Guatemalans were "bad people" who "molest kids" and how child molestation was "common" in Guatemala. The judge advised plaintiff: "If you cannot maintain your composure and follow my instructions, your case will be in danger of being dismissed."

Plaintiff complained about defense counsel's objections, accusing her of trying to confuse him and of being a "hostile attorney." Even though the judge and plaintiff's counsel repeatedly told plaintiff to stop speaking when defense counsel objected, plaintiff continued to testify when defense counsel objected. During the afternoon of the first day of his testimony, plaintiff laid down. When the judge asked him if he was ill, plaintiff stated he did not "want to be in the

5

same room with a person who stole everything from [him]."  The judge advised

plaintiff:

> I told you once before, I'll tell you again.  You're the plaintiff in this action.  You have a burden.  If you can't establish your burden, your case will be dismissed.  Okay.  So I want to just do this because you have consistently made me repeat myself.  I don't want any more disruptions, I don't want any loud, heavy breathing, I don't want any braying, I don't want any abusive name-calling and I generally want you to maintain your composure which I know you can do.  Otherwise, I will cease these proceedings and I will let her get on the stand and testify because she has a cross -- a counterclaim and I will proceed on her counterclaim and you are at risk of having your pleading dismissed.  I don't want to get into a back and forth with you.  I'm just saying this for the record.  This is about the sixth time –

Plaintiff then told the judge he needed to vomit and asked if he could go to the

bathroom.  The judge granted that request.

Plaintiff returned, and his direct examination resumed.  His counsel

subsequently asked him what he had left in the house.  Plaintiff responded

"[e]verything" and added "I'm three generations of Trenton.  She's from a

different foreign country."  The judge sustained defense counsel's objection

and instructed plaintiff.

> So in terms of the question, focus on the question and not on attacking the defendant in this case, okay?  You're not to attack her, you're not to harass her with

your responses. You're to just answer the question. Causing her, making, you know, certain allegations in an attempt to cause her further embarrassment doesn't do anything --

[PLAINTIFF]: All right.

THE COURT: -- to help your case.

. . . .

[PLAINTIFF]: I'll try to reserve comment.

THE COURT: Oh, no, you're not going to try. You're going to do it because –

[PLAINTIFF]: It's hard. I'm not doing that to –

THE COURT: Okay. First of all, don't talk over me.

[PLAINTIFF]: -- disparage anybody.

THE COURT: Don't talk over me. Yes. And I appreciate that, but what you need to hear from me because we are going to be doing this for a few more days is that, you know, under the rules of court I cannot allow you to harass her and, as I told you before, making comments about what you think about her and her family is not productive to your case at all. I will ignore those comments, but at the same time I don't want the record to be replete with those.

Plaintiff's testimony resumed and continued into the third trial day.

At the beginning of the third trial day, plaintiff's counsel asked plaintiff why the parties had separated. Instead of answering that question, plaintiff

7

replied that defendant had come "from a village in Guatemala where half the people are running around barefooted" and asserted he had "rescued her from this war-torn village." The judge sustained defendant counsel's objection. The judge asked defendant if the "irreconcilable differences" he alleged in the complaint had existed for a period of six months or more. Plaintiff responded, "[n]o, she was committing adultery unknown to me." The judge repeated the question, and plaintiff answered, "[n]o. I thought we were on the same page."

After the completion of plaintiff's direct examination and before cross-examination began, the judge issued the following instructions:

> THE COURT: I generally don't want to begin by continuing to say the same thing that I've said every time that you've been before me. I really give you the benefit of the doubt every single day because that's just how I start my day.
>
> [PLAINTIFF]: Can I --
>
> THE COURT: Do not (a) interrupt me when I'm speaking. Mr. R[.], you are going under cross[-]examination. You are to answer the questions posed unless your attorney has an objection. If he has an objection, you wait for the Court to rule on the objection. That's all I'm going to say.

Despite that instruction, plaintiff was immediately unresponsive and argumentative:

8

A-1673-20

[DEFENSE COUNSEL]: Mr. R[.], you have children, correct?

[PLAINTIFF]: That I know of.

[DEFENSE COUNSEL]: Okay. Do you have two children with the defendant?

[PLAINTIFF]: Um –

[DEFENSE COUNSEL]: It's a yes or no question, sir.

[PLAINTIFF]: They may be mine.

[DEFENSE COUNSEL]: Sir --

[PLAINTIFF]: They may be mine, I'm assuming they are mine.

[DEFENSE COUNSEL]: Okay. And what is your eldest daughter's name?

[PLAINTIFF]: If she's mine, [B.].

[DEFENSE COUNSEL]: What's her date of birth?

[PLAINTIFF]: You already know, it's already known, 7/30/05 and it's irrelevant.

[DEFENSE COUNSEL]: Okay. Can you please just answer the questions you're being asked, sir?

THE COURT: I'll instruct the witness.

. . . .

THE COURT: Just answer the questions asked.

9

Plaintiff had not previously disputed paternity and, in fact, was seeking joint legal and physical custody of the children.

When plaintiff's behavior continued, the judge gave him the following instruction:

> Okay. I'm going to give you one last time. And then we're going to allow the defendant to go on the stand and start . . . her counter claim. Just so the record is clear, Rule 611 gives the [c]ourt the authority and requires me to maintain order. This is really borderline not an orderly proceeding and we have only been on the record for about four minutes.
>
> I'm just telling you what I'm going to do, sir, so that there's no question what I'm going to do. That is, if you cannot maintain your decorum and you can't answer the questions posed, I will, and I'm giving you another warning, consider an application to dismiss your complaint and proceed with hers.

Plaintiff stated the judge was "prejudiced" and requested another judge. The judge reminded plaintiff he was represented by counsel.

Plaintiff continued to be unresponsive and argumentative during cross-examination and continued to make inappropriate comments. He asserted defense counsel "can't be trusted" and accused her of "mentioning many lies" about him, "trying to steal everything," being "not too attentive," lacking understanding, and "making a lot of money off this." The judge repeatedly had

to instruct plaintiff to answer counsel's questions and sustained objections to his testimony as being unresponsive.

Towards the end of the third trial day, after the judge had instructed plaintiff to "wait for the question" before speaking, plaintiff again declared the judge was "prejudiced" and "discriminatory" and requested another attorney and another judge. Following those statements, the judge ended the cross-examination and stated plaintiff could leave the courtroom. Plaintiff continued to be disruptive, stating the "judge is prejudiced and discriminatory and the defendant stole everything. An adulteress."

After plaintiff left the courtroom, the judge addressed plaintiff's pro se recusal request, citing Panitch v. Panitch, 339 N.J. Super. 63 (App. Div. 2001):

> In essence, that decision noted that it would be improper for a judge to withdraw from a case upon a mere suggestion that he or she is disqualified. In this case, this [c]ourt believes that the record will show that I've tried, quite frankly, every which way I can possibly imagine and know how to allow the plaintiff to present his case in a manner that comported with the court rules but that, ultimately, was fair to him and as well to the parties -- the other party -- defendant and counsel.
> The [c]ourt has repeatedly, repeatedly, beginning at the last hearing explained and advised Mr. R[.] as to how he is to conduct himself. The [c]ourt finds that the issue is that [plaintiff] is generally disruptive. He has exhibited behavior that is completely inconsistent with his own case in terms of his own need to present evidence in support of his case. He has been loud. He

11

has demonstrated extreme and open hostility and frustration to the [c]ourt, to counsel for the defendant and, perhaps, mostly to the defendant he has been abusive.

He has called the parties, his current spouse, names. He has referenced to counsel in a very inappropriate way. He has generally been out of control in these proceedings. He has cursed on the record. I've taken what I believe to be several steps to address those concerns by speaking with [plaintiff], admonishing him where necessary, taking frequent breaks to give him . . . an opportunity to cool down to allow common sense and decency to . . . settle back in. And, quite frankly, none of it has worked.

Plaintiff's counsel agreed "there's nothing substantiating" plaintiff's recusal request. He asserted plaintiff was "incompetent and cannot continue on" and had "issues psychologically and they are bubbling out to the surface." The judge reminded counsel "pretrial the [c]ourt raised an issue and there was no willingness on the part of the plaintiff to secure the actual medical reports to substantiate . . . that he was incompetent or that he was in need of a competency hearing." Defendant moved to dismiss plaintiff's complaint. The judge directed counsel to submit the motion in writing.

Defendant moved in writing for contempt based on plaintiff's behavior during the trial and to dismiss for failure to state a case and for denying defendant an opportunity to cross-examine him. Plaintiff opposed the motion and submitted an unsworn, one-paragraph letter from Andrew M. Lester, Ph.D.,

12

who stated he was treating plaintiff and that plaintiff was "unable to control his verbal behavior at times of stress and confrontation" and was "prone to inappropriate tempter outbursts under which he had no control despite the use of medication and weekly therapy . . . ." Plaintiff also submitted a letter from a psychiatrist. The parties did not include a copy of that letter in the appellate record.

After hearing oral argument, the judge granted defendant's motion. She described plaintiff as having "persisted in a pattern of disruptive and deeply unruly, aggressive, abusive behavior." The judge found plaintiff had engaged in "name-calling, calling the defendant all kinds of horrific names in definitely an attempt to embarrass her, he's cursed in court, he's moaned loudly, he expresses extreme frustration whenever things did not go his way, he breathes loudly." The judge rejected plaintiff's counsel's suggestion that she give plaintiff another chance because "the [c]ourt engaged in a number of warnings and admonishments repeatedly to advise [plaintiff] to cease and desist and he failed to yield any such warnings. His contemptuous behavior continued. It was willful in the [c]ourt's own estimation." The judge found unpersuasive plaintiff's incompetency argument, citing plaintiff's prior insistence he could stand trial, his failure to provide a medical report about his "alleged psychological

13

impairment," and his ability to "maintain several businesses[,] . . . rental property[,] and a full-time job with the State of New Jersey."

Based on plaintiff's conduct, which the judge summarized as "disruptive behavior, a pattern thereof, disparaging remarks to counsel and to the defendant, and an attempt to obstruct these proceedings," the judge held "an order for contempt is appropriate." Finding plaintiff had presented "insufficient testimony" and had "refused to submit to cross[-]examination," the judge dismissed the complaint pursuant to Rule 4:37-2 and issued an order on July 16, 2020 memorializing her decision. In that order, the judge confirmed her findings that plaintiff's behavior was "willful" and "abusive, harassing, noncompliant, and intended to embarrass [d]efendant" and that plaintiff had "refused to avail himself to cross-examination."

At the conclusion of trial, the judge entered the FJOD dissolving the marriage, awarding defendant sole legal custody of the children, equitably distributing the parties' property, and requiring plaintiff to pay child support, alimony, and sixty percent of defendant's legal fees and costs. With the FJOD, the trial judge submitted a comprehensive, forty-eight-page written opinion, setting forth her factual findings and legal conclusions on each of those issues.

On appeal, plaintiff argues we should order the trial court to conduct a new trial or reconsider the legal issues because the judge erred in holding plaintiff in contempt, striking the complaint, and failing to consider his trial testimony. He also contends the judge erred in her decisions regarding custody, parenting time, equitable distribution, alimony, child support, and counsel fees. We disagree and affirm.

II.

We "review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. . . . Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare, 154 N.J. at 411-12 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)); see also A.J. v. R.J., 461 N.J. Super. 173, 180 (App. Div. 2019). A reversal is required "only when a mistake must have been made because the trial court's factual findings are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to

15

offend the interests of justice . . . '" Spangenberg v. Kolakowski, 442 N.J. Super. 529, 535 (App. Div. 2015) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). We defer to a trial judge's credibility determinations. Gnall v. Gnall, 222 N.J. 414, 428 (2013). We review legal determinations de novo. Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020).

When considering a finding of contempt, "we must generally review the record and make a de novo determination." In the Matter of Duane, Morris & Heckscher LLP, 315 N.J. Super. 304, 311 (App. Div. 1998); see also N.J.S.A. 2A:10-3; R. 2:10-4; Amoresano v. Laufgas, 171 N.J. 532, 560 (2002). When reviewing a trial court's grant of a motion to dismiss pursuant to Rule 4:37-2(b), we apply the same standard applied by the trial court, accepting as true the evidence supporting the plaintiff's position and giving plaintiff the benefit of inferences reasonably taken from that evidence. ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 510 (2014).

"The power of our courts to punish for contempt is long established." Amoresano, 171 N.J. at 549. That "inherent authority must be exercised both swiftly and summarily in order to ensure obedience to court orders and respect for court procedures." Ibid. (quoting In re Yengo, 84 N.J. 111, 119-20 (1980)

16

(Handler, J., concurring)); see also id. at 555 ("a primary purpose underlying the contempt power is to vindicate a court's authority"). N.J.S.A. 2A:10-1, the statutory embodiment of that authority, provides:

> The power of any court of this state to punish for contempt shall not be construed to extend to any case except the:
>
> a. Misbehavior of any person in the actual presence of the court;
>
> b. Misbehavior of any officer of the court in his official transactions; and
>
> c. Disobedience or resistance by any court officer, or by any party, juror, witness or any person whatsoever to any lawful writ, process, judgment, order, or command of the court.

"Acts committed in the presence or face of the court are governed by Rule 1:10-1." Amoresano, 171 N.J. at 550. Rule 1:10-1 provides that a judge may adjudicate contempt "summarily" without an order to show cause if:

> (a) the conduct has obstructed, or if continued would obstruct, the proceeding;
>
> (b) the conduct occurred in the actual presence of the judge, and was actually seen or heard by the judge;
>
> (c) the character of the conduct or its continuation after an appropriate warning unmistakably demonstrates its willfulness;

17

(d) immediate adjudication is necessary to permit the proceeding to continue in an orderly and proper manner; and

(e) the judge has afforded the alleged contemnor an immediate opportunity to respond.

Given plaintiff's behavior while on trial before the judge, we are convinced those requirements of Rule 1:10-1 were met and that the judge did not err in adjudicating defendant in contempt.

Plaintiff's assertion on appeal that "[t]he transcript of his testimony . . . shows that there were a few comments here and there . . . but plaintiff's testimony proceeded well without major interruption" is wholly belied by the record. In the presence of the judge throughout the course of the trial, plaintiff again and again refused to answer the actual questions posed to him, made inappropriate inflammatory comments, and failed to follow the judge's repeated instructions. His behavior began before he took the witness stand, continued during his direct examination, and accelerated during cross-examination, despite the numerous warnings issued by the judge. His behavior obstructed the proceedings, particularly defense counsel's attempt to cross-examine him, and would have continued to do so had the judge not intervened. His conduct was willful, as observed by the judge and confirmed by his repeated refusal to heed her warnings and instructions.

Plaintiff's conduct and commentary were clearly intended "to intimidate, influence, impede, embarrass, or obstruct . . . the administration of justice . . . ." McAllister v. McAllister, 95 N.J. Super. 426, 439 (App. Div. 1967). His multiple assertions of court bias, acknowledged by his counsel to be unfounded, and his failure to follow the judge's directives "besp[oke] of scorn or disdain for [the] court [and] its authority." In re Daniels, 118 N.J. 51, 69 (1990) (quoting In re De Marco, 224 N.J. Super. 105, 116 (App. Div. 1988)). The judge correctly held plaintiff in contempt "to maintain order in the courtroom" and to prevent plaintiff from "interfer[ing] with or obstruct[ing] the orderly administration of justice." Id. at 61.

Plaintiff's argument that the judge was required to hold an evidentiary hearing before holding plaintiff in contempt is without merit. Rule 1:10-1 expressly permits a court to "adjudicate contempt summarily." Our Supreme Court has recognized "there are occasions when [a court's] inherent authority [to hold a party in contempt] must be exercised both swiftly and summarily in order to ensure obedience to court orders and respect for court procedures." Amoresano, 171 N.J. at 550 (quoting In re Yengo, 84 N.J. at 130 (Handler, J., concurring)). This was one of those occasions. The judge gave plaintiff's counsel an opportunity to respond orally and in writing. Plaintiff's submission

19

of unsworn letters did not necessitate an evidentiary hearing, especially when, as the judge found, plaintiff previously had refused to participate in a competency hearing, had failed to provide an actual medical report, and had been able to "maintain several businesses[,] . . . rental property[,] and a full-time job with the State of New Jersey."

The judge also correctly dismissed plaintiff's complaint pursuant to Rule 4:37-2 because plaintiff had failed to prove his case. Defendant moved to dismiss plaintiff's complaint after plaintiff had completed his direct examination and obstructed his cross-examination. Plaintiff had not listed any other witnesses in his pre-trial submission. In his complaint, plaintiff asserted the parties had "entered into a form of ceremony of marriage" in 2001 but had "experienced irreconcilable differences which had caused the breakdown of the marriage for a period of more than six (6) months . . . ." That was the basis for plaintiff's "complaint for divorce." Yet, he testified the marriage was "not legitimate." When asked by the judge if the "irreconcilable differences" he alleged in the complaint had existed for a period of six months or more, plaintiff twice answered, "[n]o." Accepting as true plaintiff's testimony, we agree with the judge that plaintiff failed to establish the factual basis to support a legal entitlement to a divorce based on irreconcilable differences. See Yaghoubinejad

v. Haghighi, 384 N.J. Super. 339, 340 (App. Div. 2006) (reversing denial of motion to dismiss divorce case because parties had not obtained a valid marriage license); N.J.S.A. 2A:34-2(i) (court may divorce a couple when "[i]rreconcilable differences . . . have caused the breakdown of the marriage for a period of six months . . . .").

Plaintiff's contention that the judge failed to consider his testimony is not supported by the record. In the July 16, 2020 order regarding defendant's motion to hold plaintiff in contempt and to dismiss the complaint, the judge did not strike plaintiff's testimony. In her oral opinion on that motion and the written opinion regarding the FJOD, the judge expressly referenced plaintiff's testimony. That she did not mention all of his testimony may be the result of her credibility determinations, to which we defer.

We affirm the remaining aspects of the FJOD challenged by plaintiff substantially for the reasons set forth in Judge Kay Walcott-Henderson's comprehensive, written opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-1673-20